**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Jeffrey Mandel Fletcher, also known as<br>Jeffrey Mandel Feltcher,<br><br>Defendant. | Crim. No. 13-34 (PJS/JJK)<br><br>**REPORT AND<br>RECOMMENDATION** |

Surya Saxena, Esq., Assistant United States Attorney, counsel for Plaintiff.

Douglas Olson, Esq., Assistant Federal Public Defender, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

This matter is before the Court on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 30), and Defendant's Motion to Suppress Statements (Doc. No. 31). On April 26, 2013, the Court held a hearing on the motions at which the parties were represented by counsel. At the hearing, Brooklyn Center Police Officer Cody Turner testified about a January 21, 2012 traffic stop in which he seized evidence from an automobile Defendant was driving. Defendant also testified for the limited

purpose of supporting his motion to suppress that evidence.[1]  The parties presented no evidence of statements Defendant seeks to suppress, and Defendant's counsel indicated that Defendant no longer intends to seek suppression of any statements.  The parties presented oral argument at the hearing.  As discussed below, the Court recommends that Defendant's motions be denied.

## FACTS

**I.     The January 21, 2012 Traffic Stop and Search**

Defendant is charged with one count of possession with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(B).  (Doc. No. 1, Indictment.)  These charges stem from Brooklyn Center Police Officer Cody Turner's[2] discovery of "crack" cocaine in a vehicle Defendant was driving on the evening of January 21, 2012.  In his pending motion, Defendant argues that the Court should suppress the drugs Officer Turner found in the vehicle because the

---

[1]     At the hearing, Defendant's counsel asserted that his client's testimony was being offered pursuant to "*United States v. Simmons*," on the limited issue of whether he consented to the search of the vehicle.  This Court assumes counsel was referring to *Simmons v. United States*, 390 U.S. 377 (1968), where the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection."  *Id.* at 394.

[2]     Officer Turner is a patrol officer with several months of skills training and three and a half years' experience on the Brooklyn Center police force.

Government has failed to show that he voluntarily consented to any search of the car.

On the evening of January 21, 2012, around 9:30 p.m., Officer Turner was patrolling in the southeast district of Brooklyn Center when he decided to drive around an area known to be a high crime area.[3] Specifically, Officer Turner decided to drive past a residence located at XXXX Bryant Avenue, which he and other members of his police force knew to be a house connected with drug trafficking.

Officer Turner did not directly approach the Bryant Avenue residence, but from a nearby intersection he was able to see a silver BMW sedan in the driveway. He explained that the engine of the BMW appeared to be running. Officer Turner drove around the block to observe the BMW from a different vantage point. After he moved his car to this new vantage point, he saw the BMW back out of the driveway. Officer Turner then turned on his police cruiser's headlights and began following the BMW.

Officer Turner followed the sedan for several blocks from a relatively close distance behind. After a few blocks, however, he saw that the BMW had pulled multiple blocks ahead of him. Officer Turner suspected the driver of the vehicle was exceeding the speed limit. The posted speed limit in the area was thirty

---

[3] As of the date of this Report and Recommendation, no official transcript has been filed in this case. The following discussion, including the quotations to witness testimony, is based on this Court's recollection of the evidence presented at the hearing and the unofficial transcript on file with the Court.

3

miles per hour, and Officer Turner estimated that the BMW was traveling around forty miles per hour. To confirm his suspicion that the driver was speeding, Officer Turner used a forward-facing radar device in his police cruiser to measure the BMW's speed. He testified that the radar measured the BMW's speed at around forty-two miles per hour.

At that point, Officer Turner accelerated abruptly to catch up to the sedan. As he approached the rear of the BMW, the driver applied the brakes and began to slow down. Because Officer Turner had cause to believe the driver of the BMW had broken the speed limit, and because he had seen the vehicle leave from the driveway of a known drug-trafficking house, Officer Turner decided to stop the BMW. As soon as he made this decision, but before activating his emergency lights, he used his police cruiser's communications system to tell other officers working in Brooklyn Center that he would be conducting a traffic stop of a vehicle that had left the Bryant Avenue residence. He also informed Hennepin County Dispatch of the vehicle's location and its license plate number. He did this to ensure that he had backup officers on the way in case the traffic stop turned out to involve more than a speeding ticket. After putting out these calls for backup, Officer Turner activated the emergency lights on top of his police cruiser. Almost immediately, the driver of the BMW pulled the car over to the right side of the road.

When the BMW stopped, Officer Turner exited his police cruiser and approached the driver's side door of the BMW. He asked the driver for his

4

license and proof of insurance. Using the driver's license, Officer Turner identified the driver as Defendant, Jeffrey Mandel Fletcher.[4] Officer Turner testified that Defendant's behavior when asked for his driver's license and proof of insurance was "very nervous," which Officer Turner characterized as Defendant rapidly looking around his car as he searched for his license and then his insurance, and Defendant talking quickly. When Defendant handed Officer Turner the insurance card for the vehicle, Officer Turner noticed that the insurance had expired, but Defendant told him that the insurance remained current. Officer Turner testified that Defendant did not appear to be under the influence of alcohol or any other substance. Officer Turner also testified that Defendant appeared to understand the English language.

Officer Turner testified that he then asked Defendant where he was coming from to see whether Defendant would mention having left the Bryant Avenue residence minutes before. Defendant said nothing about the Bryant Avenue residence, but told Officer Turner that he had just exited off Interstate 94 and was on his way to pick up his girlfriend. Because he believed that Defendant was being dishonest with him about where he had just been, Officer Turner asked Defendant "if there was anything illegal in his vehicle." Officer Turner testified that rather than providing a "yes" or "no" answer, Defendant told him "You can search it if you want to, sir." Officer Turner found this answer

---

[4] Apparently, Defendant's last name was spelled "Feltcher" on his driver's license.

surprising, because he typically receives a "yes" or "no" answer to this type of question during a traffic stop, or the driver will provide some type of excuse why he does not want the vehicle searched. After Defendant volunteered to let Officer Turner search his vehicle, Officer Turner testified that he opened the door to the car and asked Defendant to step out of the BMW.

      Defendant, testifying on his own behalf, provided a somewhat different account of his interaction with Officer Turner before he exited the vehicle. Defendant denied telling Officer Turner he could search the vehicle if he wanted to. Instead, Defendant testified that after Officer Turner asked Defendant where he was coming from, Officer Turner said "[Do] [y]ou mind if I search?" Defendant testified that he responded by saying "For what?" At that point, Officer Turner told him to step out of the vehicle and took him back to his squad car. On cross examination, Defendant agreed that he told Officer Turner he had just exited from Interstate 94 when Turner asked him where he was coming from. He admitted that he did not mention having been at the Bryant Avenue residence. Defendant explained that he left out that detail because Officer Turner did not specifically ask him about that house.

      Officer Turner testified that after Defendant stepped out of the vehicle he patted down Defendant's clothing to check for weapons. Officer Turner was alone at this point, so he then placed Defendant in the back of his police cruiser to ensure his own safety and because it was a very cold night. Defendant was not handcuffed at the time. As Officer Turner was heading back to the BMW to

6

conduct his search, Defendant tapped on the window to get Officer Turner's attention, telling Officer Turner that he was cold and that he would like Officer Turner to turn the heat up in the police cruiser. Defendant did not attempt to communicate with Officer Turner, or any other officer on the scene, during the course of the ensuing search after he asked Officer Turner to turn up the heat in the vehicle.[5]

Officer Turner then went back to the BMW and began searching the vehicle's passenger compartment with his partner, Officer Deering, who had arrived at the scene. While searching the interior passenger compartment of the car, the officers found a white pill that appeared to be a prescription medication, but they found no corresponding prescription bottle. They found three more similar pills scattered in the interior of the BMW, which led Officer Turner to suspect that the pills could be a "prescription controlled substance." Officer Deering later confirmed that the pills contained Tylenol with codeine, a "common pain killer." After they located the pills, Officer Turner found a substantial amount of cash in bills of varying denominations in the passenger compartment of the vehicle in the center console, above the visor, and scattered along the dash. Officer Turner testified that he believed the presence of so much cash in different

---

[5] There was no evidence that Defendant did anything once Officer Turner began searching the vehicle to indicate to officers that he was withdrawing any consent. "Conduct withdrawing consent must be an act clearly inconsistent with the apparent consent to search, an unambiguous statement challenging the officer's authority to conduct the search, or some combination of both." *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005).

denominations spread throughout the car was indicative of Defendant's suspected involvement in selling drugs.

When he had finished searching the interior of the car, Officer Turner released the trunk lid for the rear of the vehicle and the front hood of the vehicle. When he looked in the engine compartment under the hood of the BMW, he saw a white towel wrapped up and jammed into an area near the air intake. He removed the towel, unfolded it, and saw a plastic bag containing a large, white rocky substance that appeared to be crack cocaine. After finding this suspected crack cocaine in the plastic bag, and confirming his suspicions that it was crack cocaine with another officer on the scene, Officer Turner placed Defendant under arrest and eventually transported him back to the police station.

## II. The Missing Recording of the Traffic Stop and Search

A video and audio recording taken from a recording system built into Officer Turner's police cruiser captured the January 21, 2012 traffic stop of the BMW. That system was activated to record both audio and video of the traffic stop when Officer Turner activated his police cruiser's emergency lights. The system is designed to record video from a camera mounted on the police cruiser and audio from a microphone that was attached to Officer Turner. The recording system captured the entire interaction between Defendant and Officer Turner, including their exchange before Defendant stepped out of the vehicle.

After Officer Turner arrested Defendant and took him back to the Brooklyn Center Police Station, he reviewed the recording to assist him in completing his

report. But Officer Turner also testified that the recording was ultimately erased and no longer exists. The recording was destroyed due to a convergence of factors: (1) a traffic stop he made earlier that evening; (2) the operation of the recording system's automatic shutoff settings; (3) a mistake in the categorization of the recording of Defendant's traffic stop; and (4) the operation of Brooklyn Center Police Department's retention policies for police-cruiser recordings. The police department's retention policies preserve recordings of different types of traffic stops and arrests for different periods of time. If a recording is classified as a traffic stop with no citation, it is retained for thirty days. If the recording is classified as a traffic stop with a citation, that recording will be preserved for ninety days. If a recording is classified as a traffic stop for an offense of driving while impaired, it gets preserved for two years. Finally, if a traffic stop results in a custodial arrest and is classified as such, the recording is preserved for two years. Officer Turner indicated that the recording of Defendant's traffic stop and arrest should have been classified as a custodial arrest, which would have preserved it for two years. But Defendant's traffic stop was mistakenly classified as a traffic citation, which meant that it was automatically deleted ninety days after it was downloaded to the system at the police station.

Officer Turner testified how that mistake happened. He stated that before he encountered the BMW in the driveway of the Bryant Avenue residence on January 21, 2012, he had stopped another vehicle and issued a citation to the

driver for driving after withdrawal of his driver's license. Officer Turner explained what happened next:

> The computer remembered that traffic citation as the last known default setting for the video. I [later] conducted the traffic stop with [Defendant] on which he was arrested. I transported him to back to the Brooklyn Center Police Department jail sally port, which is the unloading garage where we pull people who are under arrest out and into jail. The car was turned off. However, the electronics and the video camera continued to record while we were inside the jail. The car has a safety mechanism built into it that will prevent the battery from getting below a certain level where the car cannot be started. When that level is reached there is a computer inside of the vehicle that's separate from all the electronics that will then cut the power to all of the electronics in the car and the video recording software will save it [the most recent recording] under the last known default setting for the video.

Normally, Officer Turner testified, he would prevent something like this from happening by manually classifying the recording as a custodial arrest when he turns off the recording system. Officer Turner admitted that he made a mistake in this instance, and that mistake caused the recording to be classified incorrectly, which in turn caused the recording to be deleted ninety days later, rather than after two years. Officer Turner testified that on the evening of January 21, 2012, he did not know that the video was going to be deleted in ninety days. He further testified that the ability to intentionally delete a video "is solely within [the Brooklyn Center] IT department[.]"

Based on these events, and primarily on the issue whether Defendant consented to the search of the BMW, Defendant seeks to suppress the evidence

Officer Turner found in the vehicle when he searched the interior passenger compartment and under the hood of the car.[6]

## DISCUSSION

I. **MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE**

   A. **Legal Standard**

Defendant's motion asserts that his Fourth Amendment rights were violated when Officer Turner searched the BMW without a warrant or probable cause to believe there was evidence of any crime in the car and because Defendant did not consent to the search.[7] He claims that the Court should suppress the evidence that was found in the BMW and that will be used against him in the trial in this case. The Fourth Amendment protects the "right of people

---

[6] Defendant also argued in the hearing that there are "some search warrants that ended up being executed based on the information coming from the automobile search." The Court understands Defendant to be arguing that the evidence seized pursuant to these search warrants must also be suppressed because the probable cause for the search warrants "flows from" the alleged unconstitutional search of his vehicle. Those search warrants are not before this Court at this time, but, given the conclusion, described below, that the search of the vehicle did not violate Defendant's Fourth Amendment rights, this Court does not reach that issue here.

[7] Defendant does not appear to argue that Officer Turner had no reasonable basis to stop the BMW, but even if he did raise this issue, this Court would conclude that Defendant's Fourth Amendment rights were not violated by any aspect of the initial traffic stop because Officer Turner had probable cause to believe that Defendant committed a traffic violation – speeding. *See United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (noting that an officer has probable cause to stop a vehicle for even a minor traffic violation regardless of whether the traffic stop is pretext for other investigation).

to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, warrantless searches are unreasonable, although consent is an exception to the Fourth Amendment's warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The Government bears the burden of proving by a preponderance of the evidence that Defendant voluntarily consented to the search. *United States v. Almendares*, 397 F.3d 653, 660 (8th Cir. 2005). Courts consider the totality of the circumstances in determining whether a defendant voluntarily consented to a search. *See United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009). Some of the factors courts typically consider in determining whether consent was voluntarily given include the defendant's age, education, intelligence, sobriety, the length of any detention, the substance of the conversation preceding the consent, whether the defendant was free to leave or subject to restraint, and whether the defendant's contemporaneous reaction to the search was consistent with consent. *United States v. Jones*, 254 F.3d 692, 696 (8th Cir. 2001).

### B. Analysis

Defendant argues that the Government has failed to carry its burden to prove that Defendant consented to the search of the vehicle because the evidence on whether Defendant agreed that Officer Turner could search was contradicted by Defendant's testimony. Defendant also asserts that the contradiction in testimony is "exacerbated by the officer's malfeasance" in the

12

deletion of the recording; if the recording of the stop had not been erased, says Defendant, it would have definitively resolved the issue of consent. And Defendant contends that the Government has presented nothing that "gives [it] the upper edge" in carrying its burden of proof.

### 1. The missing recording

First, Defendant's argument concerning the missing recording appears to ask the Court to impose some sanction on the Government based on the destruction of evidence critical to the issue of consent. If this is indeed the argument Defendant advances, it implicates the law of spoliation. However, the Eighth Circuit Court of Appeals has recently stated that it has "never 'applied the law of spoliation in a criminal case.'" *United States v. Davis*, 690 F.3d 912, 925 (8th Cir. 2012) (quoting *United Sates v. Miell*, 661 F.3d 995, 1000 n.5 (8th Cir. 2011)); *see also United States v. Tyerman*, 701 F.3d 552, 561 (8th Cir. 2012). In two recent cases the Court of Appeals has assumed, for the sake of argument, that if the spoliation doctrine could be applied in criminal cases, it would be applicable only where evidence has been destroyed in bad faith and only in the context of a defendant's request for a serious spoliation sanction such as an adverse inference. *See Davis*, 690 F.3d at 925; *Tyerman*, 701 F.3d at 561.[8]

---

[8] This Court is unaware of the Eighth Circuit having entertained, in a criminal case, some sanction less severe than an adverse inference instruction if the destruction of evidence was unintentional, as it may be in civil cases. *Compare Tyerman*, 701 F.3d at 561 (noting that the ATF's merely negligent destruction of a firearm did not warrant an adverse inference instruction) *and Stevenson v.*
(Footnote Continued on Following Page)

Even if the law of spoliation applies in a criminal case, this Court concludes that there is no proof in this case that the recording taken from Officer Turner's police cruiser was destroyed in bad faith. The only evidence concerning the destruction of that recording suggests that it was erased as a result of an accident, or, at worst, negligence. Officer Turner testified that he did not know on January 21, 2012, that the recording had been incorrectly classified. The record also shows that Officer Turner did not even have the ability to manually erase the recording himself. And Defendant elicited no testimony from Officer Turner or any other witness that called Officer Turner's testimony on these issues into question. There is, consequently, no proof that the destruction of the recording in this case was the result of any intent to destroy evidence for the purpose of suppressing the truth. This Court concludes that the law of spoliation, even if

---

(Footnote Continued from Previous Page)
*Union Pac. R.R.*, 354 F.3d 739, 746–47 (8th Cir. 2003) (clarifying that a showing of an intent to destroy evidence for the purpose of suppressing the truth is required to impose the sanction of an adverse inference instruction) *with Stevenson*, 354 F.3d at 745 ("Our interpretation of Supreme Court authority concerning a court's inherent power to sanction counsels that a finding of bad faith *is not always necessary* to the court's exercise of its inherent power to impose sanctions.") (emphasis added). This Court is also unaware of any Eighth Circuit precedent dealing with a request for a sanction in circumstances similar to this case, i.e., where the evidence that was destroyed relates only to an issue bearing on the constitutionality of a search and not to a substantive element of the charged criminal offense. *Cf. Tyerman*, 701 F.3d at 561–62 (approving of the district court's refusal to give a spoliation instruction to the jury where the ATF negligently destroyed a firearm in a felon-in-possession case); *Davis*, 690 F.3d at 925 (approving of the district court's refusal to give a spoliation instruction to the jury where the DEA destroyed a recording of the defendant's conversation with a confidential informant during a controlled purchase of crack cocaine in a possession-with-intent-to-distribute case).

applicable in a criminal case, would not require a serious spoliation sanction here.

Further, under the law of spoliation, to obtain any sanction for the spoliation of evidence, whether intentional or otherwise, the moving party must demonstrate that the destruction of the evidence was prejudicial.  *See Stevenson*, 354 F.3d at 748 (8th Cir. 2003) (noting that "[t]here must be a finding of prejudice to the opposing party before imposing a sanction for destruction of evidence").  Here, Defendant had a reasonable opportunity to contest the issue of consent.  He was able to testify on the limited issue of his consent to the search of his vehicle and tell his side of the story without waiving his Fifth Amendment right to not be compelled to be a witness against himself.  Thus, even if we were to apply the law of spoliation to this case, this Court cannot conclude that Defendant was unfairly prejudiced by the destruction of the recording, and a serious spoliation sanction is not warranted under these circumstances.

### 2. Whether the Government has met its burden

Having concluded that a serious sanction for the Government is not appropriate in this case due to the accidental destruction of the recording, we turn to the crux of Defendant's argument – that the Government has failed to meet its burden in establishing by a preponderance of the evidence that Defendant consented to the search of the BMW.

In making this determination, the contradictory testimony of Officer Turner and Defendant on the issue of consent requires this Court to make a credibility determination. *See United States v. Paul*, 315 F. Supp. 2d 1157, 1166 (D. Utah 2003) (noting that discrepancy between officers' testimony and that of the defendant on the issue of consent required a credibility ruling). This Court concludes that Officer Turner's testimony is more credible than Defendant's. Officer Turner's testimony about the series of events that occurred after he approached the BMW described a typical traffic stop where he first asked for identification and insurance. Defendant's own testimony on cross examination confirmed these details. Officer Turner's testimony about what transpired next was detailed and believable. Officer Turner recalled specific details about Defendant's nervous behavior in looking around the interior of the car when Officer Turner approached. He also recalled details about his interaction with Defendant concerning an expired insurance card. He explained that he specifically remembered Defendant's response to his question whether there was anything illegal in the vehicle because it was odd for Defendant not to give a "yes" or "no" answer. These details lend credibility to Officer Turner's version of the events.

Defendant's testimony, on the other hand, had a significant gap. Defendant did not reasonably explain, for instance, why he failed to tell Officer Turner that he had come from the Bryant Avenue residence, and instead suggested that he had arrived at the point where the traffic stop occurred

16

immediately after exiting Interstate 94.  Defendant's statement that he failed to mention coming from the Bryant Avenue residence because Officer Turner did not specifically ask about that house appeared more convenient than honest to the Court.  This Court also discredits Defendant's testimony because, if his version of the events that occurred was accurate, one would have expected him to try and communicate with the officers on the scene at some point after the search of his vehicle commenced to let them know that he did not want them searching his vehicle.  The evidence presented at the hearing that Defendant had prior involvement with the criminal justice system reinforces this Court's conclusion that Defendant would likely have objected to the search if he had not consented to it.

In reaching this credibility ruling, this Court has not ignored the fact that the recording of the interaction between Officer Turner and Defendant was destroyed.  In an appropriate case, where the record shows bad faith or at least supports an inference that law enforcement has wrongfully caused evidence bearing on the constitutionality of a search to be absent, there may be good reason to weigh the unavailability of such evidence against the Government for purposes of determining credibility.  But, given the lack of evidence that the recording here was destroyed for the purpose of suppressing the truth, and given Officer Turner's reasonable and believable explanation for how the recording came to be deleted, this is not a case in which missing evidence should negate the credibility of the Government's witness on the issue of consent.  Officer

17

Turner's willingness to admit he made a mistake that led to the destruction of the recording further convinces this Court that his other testimony about the details of the traffic stop and Defendant's consent to the search of the BMW is believable. Thus, because this Court concludes that Officer Turner's testimony is more credible than Defendant's on the issue of consent, it is more likely than not that Defendant told Officer Turner he could search the car if he wanted to.

In light of this credibility determination, this Court concludes that the Government has carried its burden to show that Defendant consented to the search. The preponderance of the evidence also shows that Defendant's consent was voluntary. There is no evidence that Defendant gave his consent in response to coercion, threats, or any duress. No weapons were drawn. No promises were made. Defendant was not handcuffed or otherwise restrained. He was detained for less than fifteen minutes before he gave his consent. He was sober, he was nearly forty years old, and he had familiarity with the criminal justice system. Defendant's contemporaneous reaction to the search was also consistent with voluntary consent. All of these factors lead this Court to conclude that Defendant's consent to the search of the BMW was voluntary.[9]

---

[9] Based on defense counsel's comments at the hearing, it appears that Defendant does not contend that he only consented to a search that was limited in scope to the passenger compartment of the vehicle or otherwise narrower than the search Officer Turner and his partner conducted. Even if Defendant did raise such a challenge, Defendant's statement that Officer Turner could search the car if he wanted to, without any subsequent "'attempt to retract or narrow'" that consent as the officers expanded the search into the engine compartment of the

(Footnote Continued on Following Page)

### 3. Conclusion

Based on the foregoing discussion, this Court concludes that Defendant's Fourth Amendment rights were not violated by the search of the BMW. Accordingly, Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 30), must be denied.

## II. MOTION TO SUPPRESS STATEMENTS

As noted at the outset of the Report and Recommendation, at the April 26, 2013 hearing, Defendant's counsel indicated that Defendant no longer seeks to suppress any statements. Therefore, this Court recommends that Defendant's Motion to Suppress Statements (Doc. No. 30), be denied as moot.

## RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 30), be **DENIED**; and

2. Defendant's Motion to Suppress Statements (Doc. No. 31), be **DENIED AS MOOT**.

---

(Footnote Continued from Previous Page)
BMW, made the scope of the officers' search objectively reasonable. *See United States v. Lopez-Mendoza*, 601 F.3d 861, 868 (8th Cir. 2010) (quoting *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986)).

Dated: May 3, 2013

       *s/ Jeffrey J. Keyes*
       JEFFREY J. KEYES
       United States Magistrate Judge

      Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **May 7, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **three** days after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

      Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.